**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHARLES J. TALOS,

    *Plaintiff*,

v.                                                                          CASE NO. 11-CV-13207

COMMISSIONER OF                                      DISTRICT JUDGE AVERN COHN
SOCIAL SECURITY,                                         MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

**I.     RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for a period of disability and Disability Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 10.)

Plaintiff was 44 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 13.) Plaintiff's employment history includes work as a semi-driver for three years and an industrial stamping press operator for twelve years. (Tr. at 100.) Plaintiff filed the instant claims on May 13, 2007, alleging that he became unable to work on May 30, 2006. (Tr. at 79, 83.) The claims were denied at the initial administrative stages. (Tr. at 26, 27.) In denying Plaintiff's claims, the Commissioner considered disorders of back, discogenic and degenerative, and affective disorders as possible bases for disability. (*Id.*) On March 12, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") James P. Alderisio, who considered the application for benefits *de novo*. (Tr. at 28-40.) In an undated decision, the ALJ found that Plaintiff was not disabled. (Tr. at 40.) Plaintiff requested a review of this decision on June 30, 2010. (Tr. at 5-6.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, on May 24, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On July 25, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

   **B.   Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations

3

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:   If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:   If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

5

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had met the insured status requirements through December 31, 2011, and had not engaged in substantial gainful activity since May 30, 2006, the alleged onset date. (Tr. at 33.) At step two, the ALJ found that Plaintiff's disorders of the back (discogenic and degenerative) and affective disorder were "severe" within the meaning of the second sequential

6

step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 33-34.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work as a press operator or truck driver. (Tr. at 39.) The ALJ also found Plaintiff was a younger individual, age 18 to 49, on the alleged disability onset date. (Tr. at 39.) At step five, the ALJ found that Plaintiff retained the residual functional capacity to perform a limited range of light work. (Tr. at 34-39.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 40.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated for back pain since 1999 when he suffered a work-related injury that was aggravated by a second injury in 2006. (Tr. at 154.) Both injuries involved picking up steel parts and experiencing a stabbing sensation in his back. (*Id.*)

On October 20, 2006, Plaintiff was examined by Sam Morkos, M.D., who assessed Plaintiff with "[m]ost probably lumbar radiculopathy secondary to herniated disc." (Tr. at 139.) Plaintiff's medications were continued, he was sent to physical/aqua therapy, and scheduled for translaminar epidural steroid injections at L5-S1 on the right side. (*Id.*) On November 2 and 20, 2006, Plaintiff underwent translaminar right L5-S1 epidural steroid injections under fluoroscopy. (Tr. at 140-41, 142-43.)

On December 17, 2006, Plaintiff was examined by Joanna Kala, D.O., who concluded that Plaintiff had back pain "due to mild L5-S1 disk herniation" and "[s]evere depression due to underlying medical condition," so she prescribed Cymbalta. (Tr. at 156.)

An MRI of Plaintiff's lumbar spine taken on January 24, 2007, showed "[v]ery minimal annular bulging at L5-S1" that was thought to not be "neurologically significant" because the

"study remains stable when compared to the prior examination" of September 15, 2006. (Tr. at 145, 149.)

On February 2, 2007, Dr. Kala also prescribed Ativan to aid Plaintiff's sleep. (Tr. at 160.) On May 2, 2007, It was noted that Plaintiff had "seen a slight improvement in strength with PT" and that he had a "full range of motion[,] normal stability, strength, and tone" of all of his extremities. (Tr. at 161, 162-63.) Plaintiff was prescribed Lyrica for "better pain relief[.]" (Tr. at 163.)

On May 9, 2007, Plaintiff underwent an echocardiogram which showed a "mild to moderate degree of left ventricular systolic dysfunction[,] . . . concentric left ventricular hypertrophy" and "mild mitral and mild tricuspid regurgitation with abnormal diastolic function." (Tr. at 170.) It was recommended that Plaintiff "obtain further cardiac evaluation." (*Id*.)

On July 16, 2007, Plaintiff was assessed by John J. Jeter, M.A., L.L.P., L.M.S.W., and Hugh Bray, Ph.D., L.P., of Disability Determination Services ("DDS"), who diagnosed Plaintiff with "Adjustment Disorder with Depressed Mood (Moderate)" and a GAF score of 55. (Tr. at 174.) It was noted that Plaintiff's depression was "reported to be directly related to his health and recent life circumstances," including issues with his son and finances. (Tr. at 173-74.)

On July 19, 2007, a Holter Monitor Report showed "no significant cardiac arrhythmias." (Tr. at 185.)

A Psychiatric Review Technique completed on August 1, 2007, by James Tripp, Ed.D., concluded that Plaintiff had an affective disorder, i.e., Adjustment Disorder with Depressed Mood. (Tr. at 187, 190.) It was also concluded that Plaintiff had no limitations in activities of daily living or in maintaining social functioning, but was mildly limited in maintaining concentration, persistence or pace. (Tr. at 197.)

On August 1, 2007, Dr. Kala noted that Plaintiff's back pain was the same as it had been, that "[p]hysical therapy was not of any benefit[,]" that the "[e]pidural injections were not of any benefit," and that Plaintiff was "not a surgical candidate." (Tr. at 225.) Dr. Kala also noted that Plaintiff had "depressive symptoms but improved." (*Id.*) Dr. Kala further stated that Plaintiff had "severe pain in his back which is highly inconsistent with the pathology that we see on the MRIs." (Tr. at 227.)

On August 2, 2007, a CT scan of Plaintiff's abdomen and pelvis was normal except for "mild arteriosclerotic changes involving the aorta and common iliac arteries." (Tr. at 177, 224.)

On August 3, 2007, after reviewing the above test results and examining Plaintiff, Sarosh Anwar, M.D., of the Michigan Cardiovascular Institute, diagnosed Plaintiff with a "mild nonischemic cardiomyopathy" and he prescribed beta-blockers. (Tr. at 179.) Dr. Anwar also noted that Plaintiff was at "an acceptable risk for donating a kidney for renal transplantation as he has only a mild left ventricular systolic dysfunction, and I would clear him for that procedure from a cardiac standpoint." (Tr. at 180.)

On August 8, 2007, Dr. Kala wrote a note indicating that Plaintiff was "unable to work since 12/01/06 until present" because of "severe back pain from work-related injury." (Tr. at 222.)

On January 14, 2008, an EEG was "normal" with "no evidence of focal asymmetry, cortical irritability, or seizure potential identified." (Tr. at 208.) "Due to a normal EEG," Dr. Kala recommended to weaning Plaintiff off Dilantin. and asked Plaintiff to abstain from alcohol. (Tr. at 209.) Dr. Kala "suspect[ed] that this seizure occurred from narcotic withdrawal and alcohol intoxication." (*Id.*)

Plaintiff was also treated by Douglas Pankratz, M.D., of Pollex Orthopaedics. (Tr. at 206.) On January 25, 2008, Dr. Pankratz noted that Plaintiff had "really gotten along fairly well," but

had injured his shoulder during his sleep. (*Id.*) Dr. Pankratz also stated that he "d[id] not see him as a surgical situation at this point." (*Id.*)

On February 13 and March 7, 2008, Plaintiff underwent right L5-S1 epidural steroid injections. (Tr. at 202, 204.)

Plaintiff was examined by Gerald Schell, M.D., on September 9, 2009, who indicated that Plaintiff "seem[ed] uncomfortable" and had "decreased range of motion of his lumbar spine and associated lumbar spasm," but had "5/5 strength" in all his muscles. (Tr. at 229.) Dr. Schell also concluded that Plaintiff had "substantial degenerative disc problem at the L5-S1 level" and that he "may benefit from discography to further evaluate the problem relative to his cervical disc change." (*Id.*)

On February 15, 2010, Dr. Anwar noted that Plaintiff had "smoked a pack of cigarettes daily for twenty years, and he was advised to discontinue smoking due to his risk for myocardial infarction and death." (Tr. at 234.)

On March 1, 2010, Dr. Anwar indicated that he would be referring Plaintiff to another doctor, Nicolae Fatu, and that Plaintiff had a "history of nonischemic cardiomyopathy with left ventricular ejection fraction estimate of about 40% by echocardiography in July of 2007." (Tr. at 232.) Dr. Anwar noted that Plaintiff "had been on beta blockade and ACE inhibition but had stopped these medicines and had not seen me for 2 ½ years until he came back two weeks ago with complaints of exertional dyspnea and very atypical chest discomfort." (*Id.*) As a result, Dr. Anwar repeated echocardiography which revealed "worsening of his left ventricular systolic function," but "no significant valvular heart disease."(Tr. at 236-37.) Dr. Anwar also noted that "Holter Monitor[ing] done two weeks ago had revealed predominantly sinus rhythm with an average ventricular rate of 91 beats per minute and only very rare premature atrial and premature

10

ventricular complexes, without any supraventricular or ventricular tachycardia. (Tr. at 232.) "[N]o significant cardiac arrhythmias were identified during that period of Holter monitoring." (Tr. at 239.) Dr. Anwar concluded that Plaintiff had "worsening of his nonischemic cardiomyopathy" and the doctor adjusted Plaintiff's prescriptions and "spent a lot of time trying to convince him of the crucial importance of taking his cardiac medications[.]" (Tr. at 232.)

In his daily activity report, Plaintiff indicated that he was able to care for his autistic son, including changing his diapers, clothing him, and feeding him. (Tr. at 116.) Plaintiff indicated that he had no problems with personal care, did not need reminders, never did cook, and that he could fold laundry, vacuum, drive, handle money (but his wife has always paid the bills), collect coins, watch television, read, socialize, lift five pounds, but could not sit or stand longer than twenty minutes at a time. (Tr. at 116-20.)

Plaintiff testified at the administrative hearing that he had been on strong pain medications, had some withdrawal from them, and experienced what was initially thought to be a seizure after having exacerbated his withdrawal symptoms by using alcohol. (Tr. at 14.) Plaintiff reported that he therefore stopped taking narcotic pain medications and instead relied on Motrin. (Tr. at 14-15.) Plaintiff also testified that even minor exertional walking, such as from one room to another, brings on shortness of breath and fatigue. (Tr. at 15.) Plaintiff's shortness of breath began nine months to a year before the hearing (Tr. at 22) and Plaintiff noted that he was "recently diagnosed with emphysema." (*Id.*) Plaintiff's counsel indicated that the "shortness of breath is more cardiac-related from a cardiomyopathy than the COPD," since the "findings on the spirometry were found to be more normal or mild . . . reduced, but mild." (Tr. at 24.)

Plaintiff indicated that he still had pain down his right leg, despite a double discectomy. (Tr. at 16-17.) Plaintiff also testified that he had to move back and forth when seated to ease his pain.

(Tr. at 19.) He stated that his wife drove him to the hearing and that they had to stop once during the two-hour drive to get gas and to stretch. (Tr. at 19-20.) Plaintiff also testified that he had to spend most of the day reclining or lying flat. (Tr. at 20.) He added that he tales over-the-counter pain medicine for pain in his neck. (Tr. at 21.) Plaintiff reported that he also took steroid injections and epidural nerve blocks for his back pain approximately one year prior to the hearing. (Tr. at 22.)

The ALJ asked the Vocational Expert ("VE") to assume a person with Plaintiff's background who could perform light work but where "[t]here would be no climbing of ladders, ropes or scaffolding, only occasionally climbing ramps and stairs," and "no overhead reaching with the right upper extremities, jobs would be simple, one and two step low stress jobs." (Tr. at 18.) The VE responded that such a person could not perform Plaintiff's past work but could perform the 3,000 "[INAUDIBLE] inspector" and the 2,000 "[INAUDIBLE]" jobs, and the 6,000 machine tender jobs available in the region. (Tr. at 18.)

### F. Analysis and Conclusions

### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he retained the residual functional capacity to perform a limited range of light work. (Tr. at 34-39.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 11.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ "failed to find Plaintiff's non-ischemic cardiomyopathy to be a severe impairment." (Doc. 11 at 11-13.) In addition, Plaintiff contends that the ALJ's RFC finding and hypothetical question "failed to accurately portray Plaintiff's exertional limitations[,]" especially those caused by cardiomyopathy such as shortness of breath and fatigue. (*Id*. at 13-14.)

#### a. Severe Impairments

With regard to Plaintiff's contention about his non-ischemic cardiomyopathy, in the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs*, 880 F.2d at 862. The test is used to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

13

In the instant case, the ALJ found that Plaintiff's disorders of the back (discogenic and degenerative) and affective disorder were "severe" within the meaning of the second sequential step. (Tr. at 33.) Plaintiff contends that the ALJ improperly omitted Plaintiff's non-ischemic cardiomyopathy from the list of severe impairments. (Doc. 11 at 11-13.) However, Plaintiff fails to recognize that once Step Two is "cleared" by a finding that some severe impairment exists, then the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 Fed. App'x at 457. "The fact that some of [a plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, any alleged omission from the list of severe impairments does not undermine the ALJ's decision.

      **b.**      **RFC Findings and Hypothetical**

The ALJ concluded that Plaintiff could perform light work, except that he could not climb ropes, ladders or scaffolds, could climb ramps and stairs no more than occasionally, could not reach overhead with his upper extremity, and could perform only simple, one- or two-step low-stress tasks. (Tr. at 34.)

The hypothetical incorporated Plaintiff's mental impairments by restricting the jobs to simple, one- to two-step low-stress tasks. (Tr. at 34; Tr. at 173-74, 187-97.) After review of the administrative record, I suggest that the residual functional capacity given in the hypothetical is supported by substantial evidence. The evidence of record reveals that although Plaintiff had degenerative disc disease at the L5-S1 level, the condition was "mild" and showed "minimal" bulging that was "stable" and was "not thought to be neurologically significant." (Tr. at 145, 149,

14

156.)[2] Plaintiff also maintained 5/5 strength and normal stability and tone in his extremities. (Tr. at 161, 162-63, 229.) In addition, Plaintiff's disc condition required only modest treatment, such as physical and aqua therapy, steroid injections, and prescription medication, which is inconsistent with a finding of disability. (Tr. at 139, 140-43, 202-04, 225.) *See Myatt v. Comm'r of Soc. Sec.*, 251 Fed. App'x 332, 334-35 (6th Cir. 2007) (modest treatment regimen is inconsistent with a finding of total disability). Finally, the opinions of Plaintiff's treating physicians support the ALJ's findings. Dr. Kala stated that Plaintiff had "severe pain in his back which is highly inconsistent with the pathology that we see on the MRIs" and Dr. Pankratz indicated that Plaintiff had "really gotten along fairly well" and was not a surgical candidate. (Tr. at 206, 227.)

In addition, although Plaintiff suffered from cardiac myopathy, Plaintiff's treating physician, Dr. Anwar, noted that it was "mild" and the evidence revealed "no significant cardiac arrhythmias" and "no significant valvular heart disease," even though there was some evidence of the condition worsening over time and "mild arteriosclerotic changes." (Tr. at 177, 179-80, 185, 224, 232, 236-37, 239.)

Finally, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that he is able to care for his autistic son, change diapers, clothe and feed him, that he has no problems with personal care, that he does not need reminders, and that he is able to fold laundry, vacuum, drive, handle money, collect coins, watch television, read, and

---

[2] I note that Dr. Schell found Plaintiff's disc disease to be "substantial." (Tr. at 229.) However, "[d]eciding what weight to give competing evidence" at the same analytical level, "such as contradicting multiple treating physicians, is an administrative finding for which the final authority rests with the Commissioner." *Bandy v. Astrue*, No. 2:10-cv-00119, 2011 WL 6141037, at *6 (M.D. Tenn. Dec. 9, 2011). I therefore suggest that the ALJ's decision regarding what weight to give the treating source opinions is supported by substantial evidence.

15

socialize. (Tr. at 116-20.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3.      Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                  s/ **Charles E Binder**

                                                  CHARLES E. BINDER
Dated: March 26, 2012                                 United States Magistrate Judge

## **CERTIFICATION**

     I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 26, 2012                           By     s/Patricia T. Morris
                                                                   Law Clerk to Magistrate Judge Binder